[Cite as *State v. Maresh*, 2014-Ohio-3410.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100122**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**MICHAEL A. MARESH**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-565381-A

**BEFORE:** Kilbane, J., Boyle, A.J., and Jones, J.

**RELEASED AND JOURNALIZED:** August 7, 2014

**ATTORNEY FOR APPELLANT**

R. Brian Moriarty
1370 Ontario, Suite 2000
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Kevin R. Filiatraut
Assistant Cuyahoga County Prosecutor
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Michael Maresh ("Maresh"), appeals the denial of his motion to suppress and his convictions for sexual battery. For the reasons set forth below, we affirm.

{¶2} In September 2012, Maresh was charged with two counts of sexual battery in violation of R.C. 2907.03(A)(1) and (A)(6). The charges arise from a relationship between Maresh, a Parma Municipal Court probation officer, and B.M., one of his probationers. Maresh was also employed as a corrections officer for the city of North Royalton. In December 2012, Maresh moved to suppress the statements he made to North Royalton Detective Dave Loeding ("Loeding") while he was in the Veterans Administration Hospital ("V.A. Hospital") in Cleveland, Ohio. Maresh argued that his statement was coerced and involuntary, claiming that he was interrogated while being treated in the hospital for mental health issues. The state of Ohio opposed the motion. The trial court held a hearing, at which the following evidence was adduced.

{¶3} On July 11, 2012, B.M.'s attorney notified Loeding of allegations that Maresh had a sexual relationship with B.M. while he served as her probation officer. After obtaining a statement from B.M., Loeding secured a search warrant for Maresh's cell phone. Loeding learned through Maresh's supervisor in North

Royalton that Maresh was on leave for Army Reserve training in Ravenna, Ohio. On July 23, 2012, Loeding went to the Ravenna base and briefly spoke with Maresh. He informed Maresh why he was there and obtained Maresh's cell phone.

{¶4} While he was still in Ravenna, Maresh called his then fiancée, Alyssa Gilpin ("Gilpin"), crying and apologizing for having an inappropriate relationship with a girl that was on probation with him. Gilpin and Maresh have a son and were living together at the time of the incident with B.M. He told Gilpin that the police came to Ravenna and served him a search warrant for his phone. Gilpin told Maresh that she was taking their son and leaving and Maresh "essentially flipped out." At that time, Maresh talked about killing himself. On a prior occasion, Maresh threatened to kill himself after Gilpin caught him cheating on her through a dating website. Subsequently, Gilpin alerted a commanding officer at the Ravenna base and asked that Maresh stay at training until everything was figured out.

{¶5} After Maresh called Gilpin, Loeding contacted her about Maresh's cell phone to figure out how to view pictures on Maresh's cell phone that were protected by a password. Gilpin told Loeding that she did not want to get involved and to speak with Maresh himself, as he wanted to speak with the police. Loeding learned from Gilpin that Maresh was in the V.A. Hospital in Cleveland.

{¶6} Maresh was sent to the V.A. Hospital, where he remained for approximately one week. Gilpin visited Maresh on two occasions at the hospital. On the first visit, Maresh was upset and embarrassed, but seemed coherent. On the second visit, Gilpin brought their son. Gilpin testified that she would not have brought their son with her if she thought Maresh was unstable. Gilpin and Maresh spoke about plans for their future and Maresh had made a list of things he needed to do to plan for their family's future. Gilpin never thought Maresh was going to kill himself. She felt that it was his way out of the situation.

{¶7} Loeding testified that he went to the V.A. hospital with North Royalton Detective Floann Rybicki ("Rybicki") on July 25, 2012, to speak with Maresh. Rybicki accompanied Loeding to the hospital and observed Loeding's interaction with Maresh. Rybicki and Loeding had to lock up their firearms with the hospital police before meeting with Maresh. Rybicki testified that Maresh wanted to speak with Loeding to "clear things up." Rybicki further testified that she did not observe Maresh to be in any type of mental distress. She thought that the interview lasted between one and one-half to two hours. The interview occurred in a conference room, not Maresh's hospital room. Hospital police brought Maresh to the room and were standing outside the door during the interview. Rybicki stood near the door while Loeding and Maresh sat at the table in the room. At one point, both Rybicki and Loeding left the room so Maresh

could write his statement. When questioned by the trial court, Rybicki testified that, based on her training in interrogation techniques, she did not observe any coercion or pressure techniques used during the questioning. She further testified that most of the time there was spent with Maresh writing his statement.

{¶8} Loeding testified that he has been a police officer for 25 years and has been a detective for 18 of those years. He testified that the hospital police brought Maresh to him and Rybicki in a separate meeting room on Maresh's floor. Loeding was unsure if Maresh was under "custody." He thought "military direction" was more appropriate because Maresh was escorted to the room by hospital police, and it did not seem that Maresh was able to leave the hospital if he wanted to. Loeding advised and explained to Maresh his *Miranda* rights orally and in writing. Maresh signed a form stating that he understood his rights, wished to waive his rights, and speak with Loeding. Loeding testified that the interview lasted approximately three hours. Loeding testified that Maresh was polite, cooperative, willing, and gave more than what was asked. "There were many times when there was not really an interrogation of questioning, it was more of [Maresh] talking fluidly." Maresh wanted Loeding to know that there was no rape. Maresh told Loeding that he had a sexual relationship with his probationer, B.M. Maresh spoke of two instances of sexual activity that occurred at B.M.'s

home. He described these instances as being without the use of force. Their relationship also included sending text messages of a sexual nature.

{¶9} Loeding testified that at no time did Maresh exercise his right to a lawyer or wish to stop the interview. Maresh began to write his statement about halfway through the interview. The handwritten statement is single-spaced and consists of three pages. The statement details the sexual relationship Maresh had with B.M. Loeding testified that he and Rybicki were in close proximity to Maresh as he wrote his statement. Loeding further testified that during the entire interview, Maresh never gave Loeding any concern that he was under any mental distress. He testified that Maresh gave the statement voluntarily. Loeding believed that Maresh was frustrated and upset about "a lot of a things in his life" and Maresh wanted to "clear the air."

{¶10} After the hearing, the trial court denied Maresh's motion to suppress. In its ruling, the trial court found that Maresh reviewed the *Miranda* rights form and signed all indicated portions of the form; Maresh willingly came to the conference room to speak with the detectives; there was no evidence that Maresh was not alert or disoriented at the time of his interview; and there was no evidence by any mental health professionals to substantiate any medical treatment or even suggest that Maresh was not competent or sane at the time of his interrogation and

interview.   The matter then proceeded to a bench trial in May 2013, at which the following additional evidence was adduced.

{¶11} On June 5, 2012, Parma Municipal Court assigned B.M. to report to Maresh after being sentenced for her second OVI.   B.M. met with Maresh and signed paperwork outlining the rules of her probation.   This form also contained her contact information, including her cell phone number.

{¶12} On her way home from court, B.M. received a text from a number she did not recognize, stating, "You looked really sexy in that dress."   B.M. texted back, "Who is this?"   She received a text in response stating, "It's your probation officer."   B.M. was shocked and found the text inappropriate.   B.M. testified that because this was her second OVI conviction, she had to get restricted license plates.  Subsequently, she had to go back to court another day in June to get a signature from a Parma Municipal Court judge.   B.M. had to meet first with Maresh, who then took the paperwork to the judge.   B.M. commented on how quickly Maresh returned with the paperwork.   Maresh replied, "me and [the judge] are pretty tight."   B.M. testified that Maresh made it seem as though he and the judge were friends.   Maresh asked B.M. to call him everyday on her way to work.

{¶13} Over the next couple of weeks, B.M. received at least 50 text messages from Maresh.   Maresh first began texting B.M. about her "butt" and texted naked pictures of himself.   Maresh demanded that B.M. send him pictures.   B.M.

testified that she "held off for a few days, and then [Maresh] just kept on, you know, send me pictures. Send me pictures, you know. I'm your probation officer." B.M. felt threatened and did not want to make him mad. She testified "I was under his authority pretty much[.]" She had never been on probation before and did not know what the consequences would be. B.M. testified that I knew he was basically in charge of me, and * * * I did send him pictures of myself[.]" B.M. texted several naked pictures of herself. B.M. testified that Maresh told her "I could be your best friend or your worse enemy." She took that to mean that "if I don't do what he says, then he could probably go to the judge and have my sentence changed or — I just felt very threatened and intimidated."

{¶14} On June 20, 2012, Maresh sent B.M. several texts, including naked pictures of himself. He told B.M. that "i can't guarantee that i won't rape u Friday limited" and "i won't tell ne one how naughty u are....its Ur probation officer and your secret!" In response, B.M. texted Maresh naked pictures of herself. The next day, on June 21, 2012, Maresh texted B.M. "What happened to calling me this morning." He also texted her sexually explicit messages. B.M. testified that Maresh showed up at her apartment at approximately 3:45 p.m. that afternoon, which was the same apartment listed on her probation forms.

{¶15} B.M. testified that she was about to take a shower when she heard her apartment buzzer. She buzzed Maresh in thinking it was one of her daughter's

friends. B.M. testified that after she opened the door, Maresh forced his way onto her and started kissing her. He pushed her onto the couch, took off her robe, and inserted his penis into her vagina. B.M. testified that his penis was inside her for approximately ten seconds. B.M. told him to stop and that "this is wrong." Maresh then stood up and told her, "I just wanted you to have a little taste of your probation officer." After that, he asked for a glass of water, which she got for him, and he left. Later that day, B.M. testified she received a text from Maresh, stating "I really am sorry about today. I really feel like I violated you and forced you when you didn't want it. I'm sorry" and "[l]ike I said, my emotions got the best of me. I won't do it tomorrow too." She testified, the next day he texted her "I really am sorry for yesterday."

{¶16} B.M. testified that Maresh continued to text her over the next several days, including a text on June 24, 2012, that stated, "[w]e still on for tomorrow?" and texts on June 25, 2012, that stated, "[w]e still on today?" "[o]kay I'll take my lunch around 12:45" and "[y]eah that's okay. Tell them your officer is paying you a visit." B.M. testified Maresh came to the apartment on June 25, 2012, at approximately 12:30 p.m. She told him not to come, so she was not expecting him. B.M. was with her daughter and her daughter's friends. They were getting ready to go to the pool in her apartment complex. Maresh told B.M.'s daughter and her friends to go outside, telling them that he had paperwork for B.M. As soon as her

daughter and friends went outside, Maresh immediately grabbed her. He put B.M.'s hand on his penis over his clothes. B.M's daughter then came back into the apartment and Maresh left. Two days later, Maresh texted B.M. "u didn't freak me out but I really am not looking for anything more than a friend with benefits" and "ok, well Im sorry for sending u mixed signals [B.M.]"

{¶17} Then, on July 4, 2012, B.M. was arrested for drinking and driving in Brunswick, Ohio. She notified Maresh of the violation, as required by probation terms. Maresh responded to her by text, stating "Im.not going to violate Ur probation [B.M.]" After B.M.'s arrest, she told her attorney about her and Maresh, who then contacted Loeding.

{¶18} B.M. further testified that all of the above activity occurred while she was ordered to report to Maresh as her probation officer. At no time was she dating Maresh, nor did she want to have a sexual relationship with him.

{¶19} On cross-examination, B.M. acknowledged that she hired another attorney and has a pending civil lawsuit against the city of Parma. B.M. testified that when she took her phone to the police, she informed them that she deleted most of the texts she sent Maresh. She explained that either she manually deleted them or her phone automatically deleted them. B.M. testified that even though she knew that the texts and naked pictures were inappropriate, she did not immediately notify the authorities or her attorney.

**{¶20}** In addition to the testimony Detective Loeding provided at the suppression hearing, Loeding testified at trial that the only major difference between what B.M. and Maresh told him is that B.M. said the sexual encounters were forceful and Maresh said they were consensual. Loeding confirmed that Maresh was working for Parma as a probation officer on both dates he went to B.M.'s apartment. Maresh texted B.M. that he was only looking for "friends with benefits" after she was arrested for her third OVI.

**{¶21}** On cross-examination, Loeding testified that B.M. told him she had a "mutual flirtation" with Maresh and she returned "sexual comments" to him. B.M. also told Loeding that she knew Maresh was coming to her apartment on June 21, 2012. She buzzed Maresh in and knew that "sex was going to happen."

**{¶22}** Joel Gaiser ("Gaiser"), the Court Administrator for Parma Municipal Court, testified that he was Maresh's direct supervisor while Maresh was a probation officer with the court. As a probation officer, Maresh was a direct link between B.M., as the probationer, and the judge. It was Maresh's job, as a probation officer, to supervise defendants assigned to him, make sure the probationers were doing what the judge ordered them to do, and notify the judge if the probationers violated any of the terms of their probation, which were ordered by Parma Municipal Court.

{¶23} Natasha Branam ("Branam") testified that she is a computer forensic specialist with the Ohio Bureau of Criminal Investigation. She analyzed B.M.'s cell phone and SIM card and Maresh's cell phone. Branam was able to extract from B.M.'s cell phone several texts from Maresh to B.M. with dates ranging from June 20, 2012 to July 6, 2012. Branam was also able to extract pictures Maresh sent to B.M.'s cell phone. Branam testified that Maresh's text history was blank prior to July 23, 2012, and his call history was blank prior to July 2, 2012. She was able to extract from the micro SD card in Maresh's phone photos of B.M. in various states of nudity.

{¶24} After the conclusion of the trial, the court found Maresh guilty of both counts of sexual battery. The court merged both counts for purposes of sentencing, and the state elected to proceed with sentencing on Count 2. The court sentenced Maresh to three years in prison and found him to be a Tier II sex offender.

{¶25} Maresh now appeals, raising the following five assignments of error for review, which shall be discussed together where appropriate.

Assignment of Error One

The trial court erred and/or abused its discretion in denying [Maresh's] motion to suppress.

Assignment of Error Two

The trial court erred and/or abused its discretion in denying the motion to suppress as the statements were not voluntary under the Fifth Amendment.

## Assignment of Error Three

The trial court committed prejudicial error by employing the wrong standard of review in its deliberations.

## Assignment of Error Four

The guilty verdict was based upon insufficient evidence.

## Assignment of Error Five

The guilty verdict was the manifest weight of the evidence.

## Motion to Suppress

{¶26} In the first and second assignments of error, Maresh challenges the trial court's denial of his motion to suppress. Maresh maintains that he was in custody at the time he gave his statement and his statement was involuntary. He cites to the fact that he was at the V.A. Hospital for mental treatment because he stated that he wanted to kill himself, and he was escorted by hospital police to the conference room.

{¶27} We note that appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In deciding a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and

evaluate the credibility of witnesses. *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). The reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). With respect to the trial court's conclusion of law, the reviewing court applies a de novo standard of review and decides whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

**{¶28}** Under *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a person who is taken into custody or otherwise significantly deprived of his freedom and subjected to interrogation by law enforcement officials must be informed of certain constitutional rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible as evidence against him. The question of whether a waiver was knowing and intelligent is a factual issue that must be determined based on the totality of the circumstances. *State v. Brewer*, 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990), citing *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976).

**{¶29}** The totality of the circumstances analysis is triggered by evidence of police coercion. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "[C]oercive police activity is a necessary predicate to the finding that a suspect involuntarily waived his *Miranda* rights and involuntarily

confessed." *Id.* A suspect's decision to waive his *Miranda* rights is made voluntarily absent evidence that his "'will [was] overborne and his capacity for self-determination was critically impaired because of coercive police conduct.'" *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

> [A] defendant's mental condition is only one factor in the totality of circumstances to be considered in determining voluntariness. A defendant's mental condition may be a "significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"

(Citation omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 34, quoting *Connelly* at 164.

{¶30} In the instant case, the record demonstrates, and the trial court thoughtfully stated:

> [Maresh is] relying on [*Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)]. * * * The court had an opportunity to review that case, and I'm going to find that that case is distinguishable from our case. * * *
>
> [I]n that case * * * the individual who was being interviewed, that interview lasted nearly four hours. The defendant lay in a bed in a hospital. He had tubes, catheters, intravenous feeding devices attached to his body. During the interview, Mincey was in and out of consciousness. He was interrupted during those periods of consciousness where the interview continued to take place. He lapsed

into unconsciousness during the interrogation and interview by the investigators. And then he also continued to ask that the interview stop, and despite his statements that he did not want to go forward, the interview continued to go forward.

I'm going to factually distinguish that case from our case. In our case, I will note for the record, the defendant is an educated person. He was interviewed on July 25th of 2012, at the Wade Memorial VA Hospital. At that time he was there and placed there by his commanding officers.

Exhibit 1 was provided to the Court and that's * * * the statement of his rights. It was provided to the defendant, it was testified it was read to the defendant, and he also signed on all indicated portions of that statement.

* * *

He was provided a chance as well to read it and he was given that opportunity before he signed it.

I'm going to indicate that in the testimony provided to the Court by both detectives there was very little in the way of interrogation of this defendant. The officers had an opportunity to sit with him, they had be advised that he wanted to speak with them. I note that he was brought willingly to the conference room. * * * [I]n this case knowing that the detectives had come to interview him, he was escorted by the security guards willingly to the conference room where he was interviewed by the detectives.

* * *

There was no evidence presented that the defendant was not alert or disoriented at the time of his interview. There was no evidence presented by any mental health professionals to substantiate any medical treatment that the defendant was receiving at that time. That there was any diagnosis that the defendant was receiving medication, or receiving any treatment at the VA to confirm or even suggest that

the defendant was not competent or sane at the time of his interrogation and interview.

The defendant's statement was I believe proper, it was given knowingly and voluntarily[.] He had an opportunity to write his statement without any pressure from the two detectives. They did stand outside the door but only because they were instructed not to leave him alone. And he provided a very detailed three and-a-half or three full pages provided to the detectives. And the majority of the interview, I think which lasted more than three hours, was allowing the defendant an opportunity to write his statement.

So I note that he was not interviewed in his hospitalization room, and that his statement was a proper statement, again knowingly and voluntarily given, after he waived his right to counsel.

{¶31} We agree with the trial court's analysis. Maresh's statement to Loeding was not coerced, nor was it involuntary. Accordingly, the trial court properly denied Maresh's motion to suppress.

{¶32} The first and second assignments of error are overruled.

Standard of Review

{¶33} In the third assignment of error, Maresh argues the trial court erred by finding that R.C. 2907.03(A)(6) is a strict liability offense. R.C. 2907.03(A)(6), provides that: "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * *[t]he other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person." Maresh argues that since this offense

does not plainly indicate a purpose to impose strict liability, the trial court should have used the "reckless standard."

**{¶34}** However, in *State v. Fortson*, 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337, this court stated:

> Sexual battery in violation of R.C. 2907.03(A)(6) is a strict liability offense; therefore, an offender's state of mind, or mens rea, is irrelevant in determining guilt. R.C. 2907.03(A)(6) states that "[n]o person shall engage in sexual conduct with another * * * when * * * [t]he other person is in custody of law * * * and the offender has supervisory or disciplinary authority over the other person." Additionally, R.C. 2901.21(B) states that "[w]hen the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense."

*See also State v. Singleton*, 11 Dist. Lake No. 2002-L-077, 2004-Ohio-1517, at ¶ 56 (holding that sexual battery of a victim "under the direct control or supervision" of the offender is a strict liability offense).

**{¶35}** Based on the foregoing, the trial court, in the instant case, considered the correct mental state during its deliberations.

**{¶36}** Therefore, the third assignment of error is overruled.

<u>Sufficiency of the Evidence</u>

**{¶37}** In the fourth assignment of error, Maresh contends that there was no evidence presented that B.M. was placed in custody or detained against her will as required by R.C. 2907.03(A)(6).

**{¶38}** The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the evidence as follows:

> Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶39}** Maresh focuses his sufficiency argument on his sexual battery conviction in violation of R.C. 2907.03(A)(6), which provides that

> [n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person.

**{¶40}** Maresh argues that the state failed to present any evidence that B.M. was placed in custody or detained against her will. Rather, he claims the evidence demonstrates that B.M. "buzzed" Maresh into her apartment and she knew that "sex was going to happen."

**{¶41}** However, as the Third District Court of Appeals in *State v. Chipps*, 3d Dist. Union Nos. 14-82-1 and 14-82-2, 1983 Ohio App. LEXIS 13030, *3 (May 17, 1983), stated:

R.C. 2907.03(A)(6) represents an exception to the general rule which permits sexual activity between consenting adults. As reflected in the committee comment[,] the section proscribes even voluntary sexual activity between an inmate and a person who has supervisory or disciplinary authority over the inmate. The purpose of the statute is to protect from sexual abuse those who come under the care and custody of the State. The statute is directed at those situations where the offender, through power conferred by the State, is able to coerce or force sexual activity by the misuse of that authority.

*See also State v. Arega*, 10th Dist. Franklin No. 12AP-263, 2012-Ohio-5774, ¶ 14.

**{¶42}** The Ohio Supreme Court has stated that

[p]robation * * * merely grants grace to the guilty person with the evident purpose of helping him to reform; yet the probated offender is still under surveillance although at large. He is not a free man; he is subject to the restraints and conditions imposed by the court during the period of his temporary freedom.

*State ex rel. Gordon v. Zangerle*, 136 Ohio St. 371, 376-377, 26 N.E.2d 190 (1940).

**{¶43}** In the instant case, the record demonstrates that B.M. was under probation with the Parma Municipal Court at the time of both incidents. It is clear that she was Maresh's probationer. She began to report to Maresh on June 5, 2012. As B.M.'s probation officer, Maresh was a direct link between B.M. and the judge. Maresh was responsible for supervising B.M., making sure she did what the judge ordered her to do, and notifying the judge if B.M. violated any of the terms of her court-ordered probation. Therefore, B.M.'s status as a probationer, the several conditions imposed on B.M., and the consequences B.M. faced for violating the

conditions while on probation to the Parma Municipal Court demonstrates that she was in the "custody of the law" at the time of both incidents.

{¶44} Therefore, after viewing the evidence in a light most favorable to the state, we conclude that any rational trier of fact could have found the essential elements of sexual battery, in violation of R.C. 2907.03(A)(6), proven beyond a reasonable doubt.

{¶45} Accordingly, the fourth assignment of error is overruled.

Manifest Weight of the Evidence

{¶46} In the fifth assignment of error, Maresh argues his conviction under R.C. 2907.03(A)(6) is against the manifest weight of the evidence. He contends that B.M.'s testimony is conflicting and unbelievable. Specifically, he refers to her initial testimony that: her phone deleted the text messages, then later admitted that she deleted the messages, and someone else let Maresh into her apartment, but Loeding testified that she told him she knew that Maresh was coming over.

{¶47} We note that in contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, has stated:

[T]he reviewing court asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶48} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶49} In the instant case, any conflicting testimony as to whether B.M. and Maresh's sexual encounters were consensual is inconsequential to Maresh's conviction under R.C. 2907.03(A)(6), a strict liability offense. B.M. was in the "custody of law" at the time of the incidents, and as a result, the trial court did not "lose its way" and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered

{¶50} Therefore, the fifth assignment of error is overruled.

{¶51} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

MARY J. BOYLE, A.J., and
LARRY A. JONES, SR., J., CONCUR