[Cite as *State v. Kohler*, 2024-Ohio-3302.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                                    :

                          No. 113394

BRANDON KOHLER,                         :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 29, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-664842-A

---

### *Appearances:*

Flowers & Grube, Louis E. Grube, and Kendra N. Davitt,
*for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, Glen Ramdhan and Daniel T. Van, Assistant
Prosecuting Attorneys, *for appellee*.

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Brandon Kohler ("Kohler") appeals his convictions and sentencing. For the following reasons, we affirm.

**Factual History**

{¶ 2} Kohler's convictions stem from alleged sexual conduct between Kohler and two victims — H.K. and A.W. — that occurred during the course of Kohler's employment as a corrections officer at the Northeast Reintegration Center ("NRC") in Cleveland, Ohio. At all relevant times, H.K. and A.W. were inmates at the facility. Female inmates transfer to NRC, a minimum-security correctional facility, as a step-down facility that helps the inmates successfully transition to their eventual release from prison.

**H.K.**

{¶ 3} H.K., a convicted felon and prior inmate at NRC, first encountered Kohler in September 2019 when H.K. worked as a dishwasher in NRC's kitchen, and Kohler worked for Aramark, NRC's food service provider. Kohler served in a supervisory position over H.K. and any reported problems by Kohler about the inmate could have resulted in H.K.'s punishment. While Aramark staff was not supposed to share personal information with inmates, Kohler and H.K. had personal conversations during their shifts together.

{¶ 4} In December 2019, Kohler started his employment at NRC as a corrections officer. In that capacity, Kohler had more authority over H.K. H.K. allegedly saw Kohler frequently since they both worked the third shift at NRC and, according to H.K., they "were pretty much the only people awake." Tr. 248. H.K. stated that in the spring of 2020, Kohler had more conversations with her, and Kohler provided H.K. with candy a few times.

{¶ 5} Kohler allegedly hugged H.K. for the first time in the spring of 2020. This occurred in the foyer of H.K.'s cell, between 2:00 and 4:00 a.m., when H.K.'s roommates were sleeping and the lights were turned off. The physical contact with Kohler resulted in mixed emotions for H.K.: she realized she could get in trouble for the behavior, and she was surprised to realize someone may be interested in her despite her criminal background. H.K. thought "I'm special, there's 500 people here, and he is giving me attention." Tr. 257. When Kohler did rounds again the following hour, he allegedly kissed H.K. and she kissed him back. H.K. testified that she liked the thought of having a relationship during the remainder of her time at NRC but she was also concerned about jeopardizing her possibility of judicial release.

{¶ 6} H.K. testified that on an unspecified date, Kohler asked her to clean the rooms in Building M where no one was residing. H.K. was not required to clean Building M on that date, but she was "excited" for the "extra interaction" with Kohler. Tr. 264-265. H.K. testified that Kohler completed his rounds that evening every 30 to 60 minutes, walking through the hallways and entering the cells; in between rounds, Kohler sat at a first-floor desk. H.K. testified that she and Kohler engaged in sexual conduct four different times throughout her shift — two instances of cunnilingus, one instance of fellatio, and one instance of digital penetration of H.K.'s vagina. At a later date, Kohler allegedly performed cunnilingus on H.K. in her bathroom, late at night. H.K. testified that she did not know if her roommate C.S. observed that interaction. NRC's security cameras do not record inside the

inmate's cells or bathrooms so none of the alleged sexual conduct was captured on camera.

{¶ 7} H.K. also testified that she and Kohler spoke flirtatiously with one another, and Kohler once grabbed her buttocks.

{¶ 8} H.K. testified that she told C.S. as well as a former inmate, C.H., about her sexual interactions with Kohler. H.K. testified that she and C.H. spoke on the telephone about Kohler and H.K. wrote a letter to C.H. about Kohler; on the telephone and in the letter, the women used the code name "Amber" to reference Kohler. The letter stated:

> Bunkie, April 20, 2020
> Oh my God!!! I have been trying to call you to tell you something important. Then I realized that even with code names I should not say it over the phone. "Amber" kissed me. It was 3rd shift. We made out all my [sic] night. I didn't go to bed until 5:30. "She" grabbed me — grabbed a handful of that fat ass too! Under the shorts (with a wink face). "She" said I'm perfect. You know I've had a crush on "her" forever! Only seven months until I file. Then I can tell you everything. Don't bring it up on the phone. I'll write you as it goes on. I wish you were here to enjoy this with me!! I love you, Bunkie! I cannot believe this is happening. Love, H.M.

Tr. 298.[1]

{¶ 9} Lloyd Brownlee ("Brownlee"), an Ohio Department of Rehabilitation and Correction ("ODRC") investigator, first discovered the alleged sexual conduct between H.K. and Kohler in October or November 2020. During an investigation on an unrelated issue, Brownlee listened to jailhouse calls between H.K. and a

---

[1] H.K.'s letter was marked at trial as State's exhibit No. 69.

former inmate, C.H. The women initially referenced the "bearded man" who they later called "Amber." The women also discussed a person they called Mr. K. Brownlee ascertained the women were discussing Kohler. Brownlee's investigation then included listening to jailhouse calls from several months prior to the incident to ascertain if he heard any references to inappropriate conduct, including sexual misconduct. During one tape recorded conversation, C.H. asked H.K. if any sexual contact had occurred with "Amber," and H.K. responded, "It's all in the letter." Tr. 168. C.H.'s home was searched, and the aforementioned letter was found.

{¶ 10} On February 9, 2021, Brownlee interviewed H.K. H.K. initially denied any sexual conduct but once Brownlee told her that he knew the identity of "Amber," she conceded that she engaged in sexual conduct with Kohler. The State played the recording of that interview at trial. H.K. had a calendar where she marked the days she had sexual contact with Kohler; the State introduced this calendar as an exhibit at trial. After revealing her alleged sexual conduct with Kohler, the NRC punished H.K. by placing her in "the hole" — a type of restrictive confinement — for 30 days, where she remained until her judicial release in March 2021.

{¶ 11} Following her judicial release, H.K. filed a lawsuit against Aramark Correction Services, Kohler, and a number of NRC employees. According to H.K., that lawsuit is closed. H.K. also testified that she has anger issues, and she "had a crush" on Kohler. Tr. 292.

{¶ 12} C.S. and C.M., H.K.'s former cellmates, testified at trial about H.K. and Kohler's interactions. C.S. testified that between April 2020 and February 2021,

she observed inappropriate behavior between H.K. and Kohler including flirting, touching, giggling, and conversations at the commanding officer's station situated in the center of the prison unit. C.S. further testified that the behavior made her uncomfortable, and she was concerned that she might get caught up in the situation and get in trouble. C.S. testified about Kohler's use of rude language with inmates other than H.K. C.S. also stated that one night Kohler kept entering the foyer of their cell and disturbing C.S. so that she told him to stop or she would report him. C.S. was no longer incarcerated at the time of trial.

{¶ 13} C.M. testified that Kohler paid more attention to H.K. than other inmates, and she observed H.K. often standing behind the commanding officer's desk with Kohler. C.M. further testified that during a third shift, Kohler requested H.K. clean a specific unit, and when H.K. returned that evening she informed C.M. that they had "kissed and touched." Tr. 319. C.M. said she also heard H.K. on the telephone talking about her interactions with "Amber," whom C.M. knew to be Kohler. C.M. stated she did not want to know too much information for fear that her knowledge could result in her transfer to another institution.

**A.W.**

{¶ 14} Kohler's second victim, A.W., a convicted felon and prior inmate at NRC, also testified that she engaged in sexual conduct with Kohler including one incident of cunnilingus and two incidents of digital penetration, while incarcerated at NRC.

**{¶ 15}** A.W. testified that she met Kohler when they both worked in NRC's kitchen. A.W. stated they worked on different shifts, but Kohler was her supervisor and had authority over her. A.W. further stated that while Kohler was employed in the kitchen, he was friendly with A.W. and told her she was pretty. A.W. testified that after Kohler became a corrections officer, Kohler continued to compliment A.W.

**{¶ 16}** A.W. testified that between December 2020, and June 24, 2021, Kohler kissed her in her cell, performed cunnilingus on her once, and digitally penetrated her twice. A.W. testified the incidents of digital penetration occurred when she was in her bunk and her cellmate was sleeping in the room; A.W. stated she was worried that her cellmate would know what was happening and she was afraid of getting in trouble. A.W. testified that Kohler walked in on her when she was showering and grabbed her from behind, and this constituted unwanted attention. A.W. further stated that she did not feel she had the power to tell Kohler to stop. A.W stated she did not want to tell anyone at NRC what was happening for fear of losing privileges or not being believed.

**{¶ 17}** A.W. testified that her cellmate, C.Mc., noticed Kohler often entered their cell upon her departure, and she asked A.W. about the situation. A.W. further testified that she told C.Mc. inappropriate behavior was occurring, but she did not provide many details because she "didn't trust anybody." Tr. 388.

**{¶ 18}** C.Mc., a former cellmate of A.W., testified that Kohler often entered their cell and lingered when doing rounds. C.Mc. never observed any physical contact between the two, although they "might have been a little flirtatious." Tr.

328. According to C.Mc., A.W. had feelings for Kohler; C.Mc. described A.W. as an attention seeker. C.Mc. stated she did not communicate to others what she observed because she did not "want to be part of drama within the institution." Tr. 329.

{¶ 19} The following events on June 24, 2021, led to NRC staff recognizing sexual conduct may have occurred between Kohler and A.W. On that date, Kohler entered A.W.'s cell, and case manager Taylor Lawson ("Lawson") unexpectedly entered the cell after him. A.W. testified that both she and Kohler were surprised by Lawson's presence, and A.W. stated that Kohler had touched her breasts, arms, and shoulder before Lawson entered the room. Lawson observed Kohler's hands on A.W.'s shoulder and elbow as if he was about to embrace her. After Lawson left the cell, Kohler allegedly told A.W. that he would "take care of it" or try to cover up the fact that they had physical contact. Tr. 364.

{¶ 20} Lawson testified that Kohler looked alarmed when he saw her in A.W.'s cell, and he frantically started kicking shoes on the ground and shuffling through the inmates' belongings. Lawson described A.W. as being "frozen" and answering Lawson's questions succinctly. Lawson stated that following the incident, she and Kohler spoke in Lawson's office, and Kohler told Lawson that he was consoling A.W. Lawson also testified that Kohler told her he had not been on his medications; he fu***d up; he was not himself; and people at NRC were starting rumors that were untrue. Lawson reported the incident to her supervisor.

{¶ 21} Two days later, Brownlee interviewed Lawson and A.W. Brownlee testified that A.W. was "very nervous, very afraid, [and] scared" at the start of her

interview, and she initially denied any wrongdoing. Tr. 178. Later that same day, A.W. made a statement that alleged sexual abuse by Kohler, and Brownlee returned to interview A.W. a second time.

{¶ 22} A.W. testified that she was willing to speak about the sexual conduct with Kohler once Brownlee assured her that she would not get into trouble. A.W. further testified that she knew what had happened was wrong, and she wanted staff to know about what had occurred. A.W. claimed the sexual conduct took place over almost a year.

{¶ 23} Following A.W.'s release from NRC in November 2021, and a subsequent halfway house in March 2022, A.W. filed a lawsuit against Kohler and other NRC employees, and the lawsuit was still pending at the time of trial.

**ODRC Investigators**

{¶ 24} In addition to the testimony of H.K., A.W., and their former cellmates, several ODRC investigators testified about the investigation of Kohler's sexual conduct and ODRC policies. Trial testimony established that ODRC policies prohibit unauthorized relationships between inmates and correction officers, including sexual conduct and sharing personal information. Corrections officers undergo annual training regarding unauthorized relationships with inmates. Additionally, NRC informs inmates when they first enter the institution that they can report abuse that occurs within the facility to staff members, and physical and verbal relationships are not permitted between the inmates and corrections officers. Several ODRC investigators testified that inmates are often reluctant to tell staff

about unauthorized sexual conduct due to distrust of the investigators as well as fear of retaliation; punishment; being returned to a more restrictive prison; and any adverse impact on the inmate's potential early release. Punishment included placement in "the hole" which entailed isolation in a one-person cell where the inmate lived and took her meals. H.K. and A.W. testified that these fears caused them to deny any sexual conduct occurred with Kohler during Brownlee's initial questioning.

**Procedural History**

{¶ 25} On September 14, 2022, a Cuyahoga County Grand Jury indicted Kohler on eight counts of sexual battery in violation of R.C. 2907.03(A)(11), alleging that the victims were confined in a detention facility and Kohler was an employee of that detention facility when the offenses occurred. Counts 1 through 5 alleged that between April 1, 2020, and February 9, 2021, Kohler engaged in three counts of cunnilingus, one count of digital penetration, and one count of fellatio with H.K.[2] Counts 6 through 8 alleged that between December 1, 2020, and June 24, 2021, Kohler engaged in three counts of digital penetration with A.W.[3] On October 3, 2022, Kohler pleaded not guilty to the charges.

---

[2] H.K. was originally referenced in the indictment as Jane Doe 1 (d.o.b.: 4/10/1992).

[3] A.W. was originally referenced in the indictment as Jane Doe 2 (d.o.b.: 7/14/1985).

{¶ 26} On August 25, 2023, the State filed an unopposed motion requesting that the court allow the jury to view, in person, the NRC facility where the alleged incidents occurred so as to see the design and layout of the housing units and "better understand the case."  On September 2, 2023, defense counsel filed an unopposed motion in limine to exclude evidence of prior acts pursuant to Evid.R. 404(B)(1). Specifically, Kohler asked the court to exclude testimony from C.S. who supposedly would testify that she witnessed Kohler tickle one of the alleged victims.  The motion in limine stated this testimony was merely intended to establish Kohler's character, and the State lacked "substantial proof" that the alleged act occurred.  There was no hearing on the motion in limine prior to trial, and the court did not rule on the motion.[4]

{¶ 27} On September 22, 2023, the State filed a notice of intent to introduce other acts evidence in accordance with Evid.R. 404(B) and R.C. 2945.59.  The State anticipated introduction of C.S.'s testimony — about the frequency with which Kohler visited H.K.'s cell and about her observing Kohler tickling H.K. — to prove motive, intent, plan, preparation, and opportunity.

{¶ 28} The case proceeded to trial, during which a jury view was conducted. Kohler made Crim.R. 29 motions that the trial court denied.  Kohler did not present any witnesses on his behalf; defense counsel argued in opening and closing statements that the witnesses lacked credibility and there was no surveillance

---

[4] This court presumes motions that are not ruled upon are deemed denied by the trial court.  *See State v. Robinson*, 2008-Ohio-4866, ¶ 30, fn. 3 (8th Dist.).

footage that corroborated their allegations. Prior to jury deliberations, the trial court amended Count 8 to allege cunnilingus rather than digital penetration. On September 28, 2023, the jury returned a guilty verdict on all eight counts of sexual battery. The trial court referred Kohler for a presentence investigation and report ("PSI") and ordered Kohler to report to probation for the installation of a GPS monitor.

{¶ 29} On October 10, 2023, in anticipation of the court's ruling on the issue, Kohler filed an objection to the court's designation of him as a sex offender under R.C. Ch. 2950, and on October 16, 2023, Kohler filed a sentencing memorandum asking the court to consider a sentence of probation.

{¶ 30} On October 23, 2023, the trial court sentenced Kohler to 12 months on each of the eight counts, with all counts to be served concurrently. The trial court denied Kohler's objection to his designation as a sex offender and classified Kohler as a Tier III sexual offender pursuant to the Adam Walsh Act. The court stayed execution of Kohler's sentence pending his appeal.

{¶ 31} On November 21, 2023, Kohler filed a timely notice of appeal, presenting two assignments of error:

> Assignment of Error I: The trial court erred and committed plain error by admitting substantial evidence of other wrongs and bad acts in violation of Evid.R. 403(A) and 404(B).

> Assignment of Error II: The trial court erred and invaded the constitutional role of the jury by classifying defendant Kohler as a Tier III sex offender under the Adam Walsh Act without submitting fact questions of consent or custodial authority to the jury.

**Legal Analysis**

**Evid.R. 404(B)**

{¶ 32} In his first assignment of error, Kohler argues that the trial court erred when it admitted substantial evidence of other wrongs and bad acts in violation of Evid.R. 403(A) and 404(B).

{¶ 33} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose it to show the accused's propensity or inclination to commit crime, or that he acted in conformity with bad character." *State v. Williams*, 2012-Ohio-5695, ¶ 15. However, Evid.R. 404(B)(2) identifies exceptions where other acts of wrongdoing are admissible for nonpropensity purposes:

> [Evidence of any other crime, wrong or act] may, be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

{¶ 34} Where the evidence of other wrongs or bad acts, also referenced as the other-acts evidence, is offered for a permissible purpose, trial courts have discretion to admit the evidence. *State v. Hartman*, 2020-Ohio-4440, ¶ 22, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed. 2019). In *Williams*, the Ohio Supreme Court provided a three-step analysis for courts to determine the admissibility of other-acts evidence: (1) was the evidence relevant, (2) was the evidence presented for a legitimate purpose

under Evid.R. 404(B)(2), and (3) was the probative value of the evidence substantially outweighed by the danger of the unfair prejudice.

{¶ 35} Further, "whether the other-acts evidence is relevant under the first step of *Williams* is dependent upon whether the evidence is offered for a nonpropensity purpose as set forth in the second step of *Williams*, i.e., a legitimate purpose for which the evidence is offered, and whether the nonpropensity purpose goes to a material issue in the case." *State v. Hale*, 2024-Ohio-1587, ¶ 65 (8th Dist.).

{¶ 36} "We review the admissibility of other-acts evidence de novo. However, 'we review the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant for an abuse of discretion.'" (Cleaned up.) *In re J.P.*, 2023-Ohio-4816, ¶ 52 (1st Dist.).

{¶ 37} Kohler was charged with and convicted of sexual battery in violation of R.C. 2907.03(A)(11), which reads: "No person shall engage in sexual conduct with another, not the spouse of the offender, when . . . [t]he other person is confined in a detention facility, and the offender is an employee of that detention facility." Sexual conduct has been statutorily defined as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶ 38} Here, Kohler argues evidence of his flirting, touching, and kissing H.K. and A.W. should have been excluded because the behavior was not directly linked to the charged crimes. Kohler also challenges the introduction of testimony about his preferential treatment of H.K. and A.W. over other inmates and how his conduct violated ODRC policies.

{¶ 39} The State counters that the referenced evidence was not offered to prove Kohler had a propensity to sexually abuse women in custody but to provide context, background information, and the setting of the case. Alternatively, the State argues the evidence was presented to establish Kohler's motive and intent.

{¶ 40} Relevant to the State's arguments, this court has found that

> Evid.R. 404(B) only applies to limit the admission of so-called "other acts" evidence that is "extrinsic" to the crime charged. *State v. Stallworth*, 11th Dist. Lake No. 2013-L-122, 2014-Ohio-4297, ¶ 37. In other words, "Evid.R. 404(B) does not apply when the acts are intrinsic as opposed to extrinsic, i.e., the acts are part of the events in question or form part of the immediate background of the alleged act which forms the basis for the crime charged." *State v. Crew*, 2d Dist. Clark No. 2009 CA 45, 2010-Ohio-3110, ¶ 99. Thus, "evidence of other crimes or wrongs may be admitted when such acts are so inextricably intertwined with the crime as charged that proof of one involves the other, explains the circumstances thereof, or tends logically to prove any element of the crime charged." *State v. Davis*, 64 Ohio App.3d 334, 341, 581 N.E.2d 604 (12th Dist.1989), citing *State v. Wilkinson*, 64 Ohio St.2d 308, 415 N.E.2d 261 (1980); *State v. Long*, 64 Ohio App.3d 615, 582 N.E.2d 626 (9th Dist.1989).

*State v. Jones*, 2018-Ohio-498, ¶ 140 (8th Dist.), *rev'd on other grounds. See also State v. Baird*, 2023-Ohio-303, ¶ 61 (cleaned up) (S. Gallagher, J., concurring in judgment only) ("'[E]vidence of other crimes may be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves

the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged.'"'")

{¶ 41} In *State v Bogan*, 1998 Ohio App. LEXIS 3633 (8th Dist. Aug. 6, 1998), the appellant argued the trial court improperly allowed witness testimony that he promoted prostitution prior to the date when appellant was arrested for the offense. This court found the prior bad-acts testimony was not introduced as propensity evidence but to demonstrate a continuing course of action. In other words, "the evidence was part of the events in question or form[ed] part of the immediate background of the alleged act which form[ed] the basis for the crime charged." *Bogan* at * 6. Thus, Evid.R. 404(B) did not apply to the intrinsic evidence, and the evidence was properly admitted.

{¶ 42} Similarly, in *State v. Crew*, 2010-Ohio-3110 (2d Dist.), the Second District Court of Appeals found testimony that Crew acted previously as a pimp for Hanson was intrinsic evidence showing the nature of Crew and Hanson's relationship at the time of the offense. The testimony was part of the immediate background of the alleged act and was not subject to Evid.R. 404(B). The admissible testimony in both *Bogan* and *Crew* did not occur contemporaneously with the alleged offenses.

{¶ 43} The jury is entitled to hear evidence that allows them to gather "'a complete picture of what occurred'" and "fully comprehend the acts that formed the immediate background of the charged crimes." *State v. Miller*, 2023-Ohio-1141, ¶ 92 (8th Dist.) The alleged other-acts information provided the jury insight into

Kohler's relationships with H.K. and A.W. and the setting at NRC. The inmates' testimony corroborated Kohler's preferential treatment of H.K. and A.W. over other inmates. The testimony about ODRC policies demonstrated the behavior expected by both Kohler and the victims and the reasoning why the women may have been fearful to admit to the sexual conduct. This background information explained the circumstances of the case by providing meaning to H.K. and A.W.'s testimony and context to the events leading up to the charged offenses. Thus, the testimony in dispute was not subject to Evid.R. 404(B) and was properly admitted by the trial court.

{¶ 44} Even assuming the testimony in question constituted other-acts evidence subject to Evid.R. 404(B), we find the evidence would have been admissible as common scheme or plan evidence.

> Scheme, plan, or system evidence is relevant in situations where the other acts form part of the direct background of the alleged act which forms the basis of the crime charged in the indictment. *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 315-316, 415 N.E.2d 261. "The federal courts in construing Federal Rules of Evidence 403 and 404(B), have noted that the jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void -- without knowledge of the time, place and circumstances of the acts which form the basis of the charge. *Id.* at 317." "***[E]vidence of other crimes may be presented when 'they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged.'" *Id.*, citing *United States v. Turner* (C.A. 7, 1970), 423 F.2d 481, 483-484, *United States v. Calvert* (C.A. 9, 1975), 523 F.2d 895, 907.

*State v. Vason*, 2007-Ohio-1599, ¶ 14 (8th Dist.).

{¶ 45} We find that the challenged other-acts testimony provides background information that is "so blended or connected" with the alleged crimes of sexual battery that it explains the circumstances of the crimes and falls under an exception to the admission of evidence under Evid.R. 404(B). Further, the probative value of the evidence — to provide background and explain the circumstances — was not substantially outweighed by the danger of unfair prejudice.

{¶ 46} In light of the foregoing, we cannot conclude that the admission of the disputed testimony was an abuse of discretion. Therefore, Kohler's first assignment of error is overruled.

**Tier III Sex Offender**

{¶ 47} In his second assignment of error, Kohler argues that the trial court violated his right to a jury trial, pursuant to the Ohio Const. art. I., § 5 and U.S. Const., amend. VI, when the court classified him as a sex offender under R.C. 2950.01 rather than require the jury to decide if the sexual conduct in question was consensual and if the sexual conduct occurred while H.K. and A.W. were under the custodial authority of Kohler.

{¶ 48} Kohler was found guilty of sexual battery in violation of R.C. 2907.03(A)(11) because he engaged in sexual conduct with H.K. and A.W. — neither of whom were his spouse — when H.K. and A.W. were confined at NRC, a detention facility, and Kohler was an employee of NRC. A violation of R.C. 2907.03 represents a sexually oriented offense. R.C. 2950.01(A)(1). One who commits a sexually

oriented offense is a sex offender, unless he or she falls into one of the two statutory exceptions. R.C. 2950.01(B).

{¶ 49} Sex offenders are classified as Tier I, Tier II, or Tier III offenders contingent upon the convicted offense. R.C. 2950.01. "Tier classification is based solely upon the offense for which a person is convicted[,] and the judge has no discretion to modify the classification." *State v. Blankenship*, 2015-Ohio-4624, ¶ 11, citing *State v. Williams*, 2011-Ohio-3374, ¶ 20. The tier status dictates the statutory notification and registration requirements of the sex offender. R.C. 2950.03. A sex offender convicted under R.C. 2907.03 is a Tier III sex offender unless he meets an exception. R.C. 2950.01(G)(1)(a), R.C. 2950.01(B)(2).

{¶ 50} R.C. 2950.01(B)(2) states two exceptions to the designation of a sex offender:

> (B)(2) "Sex offender" does not include a person who is convicted of, pleads guilty to, has been convicted of, has pleaded guilty to, is adjudicated a delinquent child for committing, or has been adjudicated a delinquent child for committing a sexually oriented offense if the offense involves consensual sexual conduct or consensual sexual contact and either of the following applies:
>
> (a) The victim of the sexually oriented offense was eighteen years of age or older and at the time of the sexually oriented offense was not under the custodial authority of the person who is convicted of, pleads guilty to, has been convicted of, has pleaded guilty to, is adjudicated a delinquent child for committing, or has been adjudicated a delinquent child for committing the sexually oriented offense.
>
> (b) The victim of the offense was thirteen years of age or older, and the person who is convicted of, pleads guilty to, has been convicted of, has pleaded guilty to, is adjudicated a delinquent child for committing, or has been adjudicated a delinquent child for committing the sexually oriented offense is not more than four years older than the victim.

R.C. 2950.01(B)(2)(a)-(b). Application of either exception first requires a finding that the parties engaged in consensual sexual conduct.

{¶ 51} Following the jury's verdict finding Kohler guilty of sexual battery and before sentencing, Kohler filed a written objection to his designation as a sex offender. Kohler's written objection did not argue a constitutional violation, as he now argues on appeal, but that the jury failed to make a finding of (1) lack of consent or (2) custodial authority. Kohler argued that the State had the burden to prove the R.C. 2950.01(B)(2) exceptions did not apply, and the State failed to do so. In opposition, the State argued that it introduced sufficient evidence at trial establishing Kohler's custodial authority over H.K. and A.W. and lack of consent, thereby negating application of the R.C. 2950.01(B)(2) exceptions.

{¶ 52} We note that because Kohler did not raise his constitutional arguments at the trial court, we review this assignment of error for plain error. *State v. Dames*, 2020-Ohio-4991, ¶ 14 (8th Dist.). Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice. *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, (1978), paragraph three of the syllabus ("Notice of plain error . . . is to be taken with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice"). To prevail under plain error, Kohler must establish that "'an error occurred, that the error was obvious, and that there is "a reasonable probability that the error resulted in prejudice," meaning that the error affected the outcome of

the trial.'" *Id.*, quoting *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 2015-Ohio-2549, ¶ 22.

{¶ 53} The evidence established that sexual conduct occurred when Kohler served in his role as an NRC corrections officer and while H.K. and A.W. were inmates at NRC and, therefore, Kohler violated R.C. 2907.03(A)(11), a strict liability offense. *State v. Mole*, 2016-Ohio-5124, ¶ 2. Strict liability offenses do not specify any degree of culpability, and courts will "impose liability for simply doing [the] prohibited act." *State v. Johnson*, 2010-Ohio-6301, ¶ 17.

{¶ 54} R.C. 2907.03(A)(11), which criminalizes sexual conduct based solely on the relationship of a detention-facility employee and detainee, applies "where the defendant has a position of authority to prevent the defendant from taking unconscionable advantage of the victim." *State v. Reyes-Rosales*, 2016-Ohio-3338, ¶ 35 (4th Dist.). Further,

> [t]he purpose of the statute is to protect from sexual abuse those who come under the care and custody of the State. The statute is directed at those situations where the offender, through power conferred by the State, is able to coerce or force sexual activity by the misuse of that authority.

*State v. Maresh*, 2014-Ohio-3410, ¶ 41 (8th Dist.), quoting *State v. Chipps*, 1983 Ohio App. LEXIS 13030, *3 (3d Dist. May 17, 1983). The Ohio Supreme Court has stated that the purpose of R.C. 2907.03 "is to protect particularly vulnerable people . . . who are legally unable to consent to sexual activity, from the harms that flow from sexual conduct." *Mole* at ¶ 43.

{¶ 55} The jury's verdict finding Kohler guilty of sexual battery in violation of R.C. 2907.03(A)(11), impliedly determined that H.K. and A.W., inmates subjected to sexual battery by Kohler in an authoritarian position, were legally unable to consent to the sexual activity. Because H.K. and A.W. could not consent to sexual conduct while they were inmates, the R.C. 2950.01(B)(2) exceptions — that apply only upon a finding of consensual sexual conduct — are inapplicable and, by operation of law, the trial court was mandated to designate Kohler as a sex offender. Accordingly, it was not plain error for the trial court to designate Kohler as a Tier III sex offender, and Kohler's second assignment of error is overruled.[5]

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to trial court for execution of sentence.

---

[5] While we review the second assignment of error for plain error, we note that this court would reach the same decision even if we applied a de novo standard of review. *See Arbors E. RE, L.L.C. v. Franklin Cty. Bd. of Revision*, 2018-Ohio-1611, ¶ 13, citing *Akron Centre Plaza, L.L.C. v. Summit Cty. Bd. of Revision*, 2010-Ohio-5035, ¶ 10 ("Our review of a legal issue is de novo, not deferential.").

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
MARY J. BOYLE, J., CONCUR